IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

IN THE MATTER OF THE SEARCH OF ELECTRONIC DEVICES CURRENTLY LOCATED AT FBI, 185 ADMIRAL COCHRAN ROAD, ANNAPOLIS, MD

Case No. TMD 15-823

FILED LODGED ENTERED RECEIVED
MAY 13 2015
AT GREENBELT
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY DEP

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

I, Margaret Mande, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—electronic devices—which are currently in law enforcement possession and more fully described below and in Attachment A, and the extraction from that property of electronically stored information described in Attachment B.

2. I have been a Special Agent with the FBI since May 2010. I am currently assigned to the Maryland Child Exploitation Task Force (MCETF) in FBI's Baltimore Division, located in Annapolis, Maryland. Since joining the FBI, I have been involved in multiple investigations concerning violations of federal criminal laws, to include investigations involving child sexual exploitation with a focus on online child sexual exploitation, child pornography and child prostitution matters involving the Internet; I have gained experience through training in seminars, classes, and daily work related to conducting these types of investigations. As a federal agent, I am authorized to investigate violations of laws of the United States and am a law

TMD

mm M
4/23/15

enforcement officer with the authority to execute warrants issued under the authority of the United States.

3. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

**IDENTIFICATION OF THE DEVICE TO BE EXAMINED**

4. The property to be searched is described as follows:

a. Device A: Alcatel One Touch Tablet, Model P310A, FCCID: RAD451

b. Device B: iPhone 6, IMEI: 35206606669769

c. Device C: iPhone 6, Model A1592, IMEI: 35438606486320

d. Device D: iPhone 4S, model A1387, FCCID: BCG-E2430A

e. Device E: iPad Air, Serial Number: DMQLXVGDF4YD

f. Device F: HP G61 Laptop, Serial Number: CNF9435TFJ

g. Device G: Motorola cellular phone, IMEI: 359413000759979

h. Device H: HP Pavilion 20 All-In-One, Model 20-B010, Serial Number: 3CR3050TMM

i. Device I: iPhone 6, Model A1549, IMEI: 356987065756874

j. Device J: Blu cellular telephone, Model Dash 5.5, IMEI 1: 353791061320591

5. The above listed Devices are currently located at the FBI Annapolis Resident Agency, 185 Admiral Cochran Road, Annapolis, Maryland.



MM
4/23/15

6. The applied-for warrant would authorize the forensic examination of Devices A-J for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

7. On April 1, 2015, a 16 year old female, Victim 1, came into the Prince George's County Police Department District 3 Station located at 7600 Barlowe Road, Landover, Maryland, 20785 and reported that she had been working as a prostitute under the control of a pimp by the name of "Mike" since early January 2015.

8. A Prince George's County Police Detective from the VICE Intel Squad and I reported to the District 3 Station to interview Victim 1. During that interview, Victim 1 reported that she met "Mike" on Instagram in approximately December 2014. Victim 1 stated that her Instagram account Vanity Name was bubblewrap_ and she has changed the name to her account to magicbox__. "Mike's" Instagram account Vanity Name is atw_silent. Victim 1 stated that "Mike" had followed her on Instagram and then "Mike" sent Victim 1 a friend request. Victim 1 and "Mike" exchanged chat messages via direct message on Instagram. During their chat conversations, Victim 1 reported that "Mike" asked Victim 1 if she wanted to make money, which Victim 1 interpreted to mean "Mike" was asking Victim 1 if she wanted to prostitute. "Mike" then asked Victim 1 to "hang out" with him. Victim 1 then called "Mike" from her cell phone.

9. In early January 2015, when Victim 1 was still 15 years old, "Mike" picked Victim 1 up at Prince George's Plaza in a car. Victim 1 reported that "Mike" took Victim 1 to the Knights Inn in Laurel, Maryland and engaged in sexual intercourse with her. "Mike" told Victim 1 about Backpage.com and "Mike" told Victim 1 that he made an advertisement for



4/23/15
mn

prostitution services for her. "Mike" told Victim 1 that Backpage was similar to Craigslist. "Mike" showed Victim 1 advertisements of other females who were advertising for prostitution online. "Mike" then started to call females from Backpage.com to allow Victim 1 to listen to how they answer the phone to arrange a date with a "client" looking for sexual services. "Mike" then drove Victim 1 to her friend's house in Silver Spring, Maryland.

10. Victim 1 reported that a few days after "Mike" dropped off Victim 1 in Silver Spring, "Mike" again picked up Victim 1 in a car in Silver Spring. At this second meeting, "Mike" was accompanied by his girlfriend "Elsie." "Mike" and "Elsie" drove Victim 1 to the Days Inn in College Park, Maryland. "Elsie" and "Mike" gave Victim 1 condoms and some clothing. "Mike" posted the online advertisement that he had created offering Victim 1 for prostitution under the name of "Cassie." "Mike" had also set up a "Pinger" account for Victim 1 to use for acts of prostitution. "Mike" and "Elsie" left Victim 1 at the Days Inn. Victim 1 reported that "Elsie" answered initial phone calls by clients in response to ads posted for Victim 1. "Elsie" and Victim 1 could log into the Pinger app allowing both to see the text messages from clients. Victim 1 stated that "Elsie" would use her phone to set up dates with those clients for Victim 1. "Elsie" would speak to the clients and then contact Victim 1 to describe the individual who would be coming to meet Victim 1 at the hotel to engage in commercial sex acts.

11. When Victim 1 initially started working with "Mike" in January 2015, Victim 1 split the money paid by each client with whom she engaged in commercial sex acts equally with "Mike." "Mike" determined the rates that clients would have to pay to engage in commercial sex acts with Victim 1. Victim 1 reported that, at one point, after she was raped and robbed by a client, "Mike" began to keep all of the money Victim 1 was paid for engaging in commercial sex acts.



4/23/15 mm

12. Victim 1 reported that "Mike," "Elsie," and another individual named "David" transported her in different vehicles to various hotels in Maryland, the District of Columbia, and Virginia to engage in commercial sex acts. "Mike" located and arranged payment for the hotel rooms.

13. During the initial interview, Victim 1 reported that she believed "Mike's" last name was "Devilla." Victim 1 also reported that "Mike" had noticeable tattoos on his neck – lips on one side and Chinese writing on the other side. Prince George's County Police detectives located a Motor Vehicle Administration ("MVA") photograph of a **MICHAEL ANDREW DAVILA**, DOB September 20, 1988, and showed that photograph to Victim 1, who immediately identified the individual depicted as the person she knew as "Mike" who had acted as her pimp.

14. **DAVILA** is currently on probation in Montgomery County Maryland for drug-related charges. On April 2, 2015, law enforcement contacted the Montgomery County Office of Probation and Parole regarding **DAVILA**. An individual from that office informed the detective that **DAVILA** may be residing with his girlfriend **ELSIE LISETH PAZMINO**, DOB April 2, 1987, at 8427 57th Avenue, Berwyn Heights, Maryland.

15. During the initial interview on April 1, 2015, Victim 1 also gave me the ZTE cellular phone provided to her by **DAVILA**. Victim 1 provided consent to search that phone. The phone number for that phone is (202) 499-9980 and the cell phone provider is T-Mobile. That phone also contained text messages with **DAVILA** at phone number (301) 200-0039. In a review of websites known to advertise for prostitution, I located both of these phone numbers in connection with online ads advertising "Cassie" for prostitution. As noted above, Victim 1 reported that **DAVILA** advertised her under the name "Cassie" in online prostitution ads.



4/23/15
mm

16. Through the course of this investigation, I located an additional telephone number, (443) 422-2249, associated with online advertisements for "Cassie" for prostitution. Advertisements associated with phone number (443) 422-2249 included the same photos used for the online advertisements associated with the phone numbers referenced above in paragraph 12. Upon preserving the telephone data for various phone numbers associated with the investigation, I was informed that Pinger, Inc. is the subscriber for telephone numbers (301) 200-0039 and (443) 422-2249. Pinger, Inc. provides a texting and voice-over IP application ("app") for cellular phones, tablets, and computers that allows a user to select from available phone numbers based on location from which the user can then send text and SMS messages and make calls to anyone or any group.

17. On April 9, 2015, I obtained records from Pinger for phone numbers (443) 422-2249 and (301) 200-0039.

18. Pinger provided the following relevant customer information for phone number (443) 422-2249:

a. Name associated with account: "Cassie Love"

b. Pinger username: cassilove305

c. Account creation date and time: 2015-01-12 22:02:18 (GMT)

d. Email address associated with accounts: ninalovedmv@gmail.com

19. Pinger provided the following relevant customer information for phone number (301) 200-0039:

e. Name associated with account: "Mike Pinger"

f. Pinger username: misscassi305

g. Account creation date and time: 2015-03-18 03:14:18 (GMT)



DMW

4/23/15
mm

h. Email address associated with accounts: cassielovebookings@gmail.com

20. On April 9, 2015, I received records from Backpage.com in response to a subpoena. The records provided contained numerous ads posted between January 12, 2015 and March 27, 2015 in Northern Virginia, Maryland, and the District of Columbia in the "adult entertainment: escorts" section of the website advertising "Cassie" as a 23 year old female looking for older men to "spend some time with." The ads also used terms such as "incalls," "sexy," "mind numbing experience," and "specials." Based on my training and experience, these ads appear to be advertising "Cassie" for prostitution. The ads for "Cassie" received from Backpage.com were associated with an account under email address ninalovedmv@gmail.com. I located ads with the following contact numbers relevant to this affidavit for "Cassie": (202) 499-9980 and (443) 422-2249. The ads posted on Backpage for "Cassie" used the same photographs that I saw in my search for ads for "Cassie" on other internet websites known to advertise for prostitution.

21. In my initial review of text messages located on the phone provided by Victim 1, I located text messages from March 2015 between Victim 1 and **DAVILA** in which they discuss how much money Victim 1 should make on a particular night, where **DAVILA** will pick Victim 1 up outside a hotel, posting of ads, and other messages indicative of conversations about prostitution. During the review of Victim 1's cellular telephone the following text messages were found on March 23 through March 24, 2015 between **DAVILA** at (301) 200-0039 and Victim 1's phone at (202) 499-9980:

| Time | (301) 200-0039 | Victim 1 |
|---|---|---|
| 1:53 PM | Its mike | |
| 3:01 PM | Ru OK [victim 1 first name] | |
| | | Yeah |
| 3:02 PM | Calls coming along | |



DMM

4/23/15
mm

| Time | (301) 200-0039 | Victim 1 |
|---|---|---|
| 3:05 PM | | Yeah saw two already |
| 3:09 PM | Bet baby | |
| - | - | - |
| 4:41 PM | OK how much u got rn boo | |
| 4:43 PM | | 210 |
| 4:44 PM | Kk boo…I'm doing calls with Esco so once we done I'll let u know when to stop… | |
| | | Okay |
| 4:45 PM | Let me know once it starts to slow down so I can repost | |
| | | Okay |
| - | - | - |
| 9:42 PM | Anything boo I reposted calls coming back | |
| 9:44 PM | | Yes I'm getting calls |
| 9:48 PM | Thank u | |
| 10:27 PM | Boo u think its likely to make like 200 more and that's it?<br>Tonight? | |
| 10:28 PM | | Yeah that was my plan |
| 10:32 PM | Cool are u close to that let me know when u are so we can crash… | |
| 10:33 PM | | I'll let you know |
| 10:36 PM | K | |
| 11:44 PM | Hey | |
| | | Hey |
| 11:45 PM | U have anybody on the way | |
| 11:46 PM | | Yeah |
| | OK in how long Cuz we close | |
| 11:47 PM | | He's at the gas station getting condoms |
| | Cool how much u got aside from that one | |
| - | - | - |
| March 24, 2015 | | |
| 12:00 AM | | Someone else is here |
| 12:01 AM | Bet | |



DMD

4/23/15
mm

| Time | (301) 200-0039 | Victim 1 |
| --- | --- | --- |
| 12:12 AM | | This guy is leaving but the other one will be here right after |
| 12:13 AM | Cool | |
| | Take or time and take as many plsss | |
| 12:14 AM | | Oh now I'm not rushing? |
| | NO | |
| | Take everything pls | |
| 12:15 PM | I'll sleep in the car I really need that 200 from u boo | |
| | | Ok we need to talk. |
| | | Tomorrow |
| 12:26 PM | | Someone's here |

22. I also located text messages that appear to be conversations with individuals setting up dates to engage in commercial sex acts with Victim 1. For example, I reviewed a text conversation from March 27, 2015 between Victim 1's cell phone and the telephone number (571) 221-2530 in which an individual asked Victim 1 if Victim 1 was available for an "outcall" in Virginia.

| Time | (571) 221-2530 | Victim 1 |
| --- | --- | --- |
| 12:33 PM | R u available for outcall in Alexandria Virginia | |
| 12:34 PM | | Hey and yes I am.. hhr120 hr200 |
| 12:35 PM | Half hour is good | |
| | | Ok house or apt? Age and race? |
| 12:36 PM | Apt) 48 blk | |
| | | Ok that's perfect address and I'll see you soon. |
| 12:27 PM | 2727 duke st Alexandria Virginia 22314,#519 | |
| 12:41 PM | | Be there in 15mins |
| 12:42 PM | Ok | |
| 12:51 PM | | Carydale east? |
| | Yes | |



4/23/15
mm

23. I reviewed a text message conversation dated March 23, 2015 between Victim 1's cell phone and the telephone number (804) 980-9300 that read as follows:

| Time | (804) 980-9300 | Victim 1 |
|---|---|---|
| 2:07 PM | Hello I called but went straight to voicemail are you still working in laurel | |
| 2:11 PM | | Sorry about that baby I didn't get your call but yes I'm in laurel |
| 2:13 PM | How much is the donation for time | |
| 2:16 PM | | My short stay is 70 today |
| 2:17 PM | Ok you on 197 or 198 | |
| 2:19 PM | | I'm on 198 |
| 2:20 PM | | 12525 laurel bowie rd |
| 3:18 PM | K just seen your reply I will be leaving bowie at 340 to come see you | |
| 3:39 PM | | Okay hun. How old are you and what's your race? |
| 3:47 PM | 34 and I'm mixed black and Dominican | |
| 3:51 PM | | Okay. Let me know when you're close |
| 3:59 PM | I'm like 5 min away | |
| 4:01 PM | | Okay |
| | Pulling up what's your number | |
| 4:03 PM | Room number | |
| 4:04 PM | | 113 |

24. On April 3, 2015, I and the PG County detective met with Victim 1 for another interview. During that interview, we presented an MVA photograph of **PAZMINO** to Victim 1, who immediately identified the individual depicted as the person she knew as "Elsie" who had transported Victim 1 to hotels to engage in commercial sex acts and had answered calls to set up dates for Victim 1.



4/23/15
mm

25. Also on April 3, 2015, Victim 1 pulled up an Instagram account with the Vanity Name iambpn for someone that Victim 1 knew to be an associate of **DAVILA**. Victim 1 showed law enforcement officers a photograph on that Instagram page of a group of individuals, including an individual that Victim 1 knew as "David" who had transported Victim 1 to hotels to engage in commercial sex acts. Victim 1 reported that **DAVILA** paid "David" $200 for transporting Victim 1 to hotels and to out-calls (encounters where Victim 1 would travel to the location of the client to engage in commercial sex acts rather than have the client come to the hotel where she was staying).

26. Victim 1 also pulled up **DAVILA's** Instagram page, atw_silent, which had a photo of the same group of individuals including "David." **DAVILA's** Instagram page also had a quote on it stating: "I will not chase you. Im a pimp, I got a limp, I cant run."

27. Also on April 3, 2015, law enforcement officers transported Victim 1 to identify various hotels where Victim 1 had engaged in commercial sex acts. Victim 1 directed me to the following hotels: Days Inn, College Park; Ramada, College Park; Howard Johnson, College Park; Holiday Inn, College Park; and Super 8, College Park. Law enforcement obtained receipts from all of those hotels. **DAVILA** paid for rooms at the Days Inn on January 12-16, 2015, and January 21 and 24, 2015. **DAVILA** paid for rooms at the Ramada on January 9, 2015; March 8, 2015; March 17, 2015; and March 24-26, 2015. **DAVILA** paid for rooms at the Super 8 on February 17, 2015. **PAZMINO** paid for the Holiday Inn on January 31 – February 2, 2015; and February 14-15, 2015.

28. Law enforcement officers also obtained a receipt from the Knights Inn showing that **DAVILA** paid for a room on January 5, 2015, which is consistent with the timeframe that



TMM

4/23/15
MM

Victim 1 reported that **DAVILA** first picked up Victim 1 and took her to that hotel to engage in sexual intercourse with him and taught her how to answer calls soliciting commercial sex acts.

29. During the interview on April 3, 2015, Victim 1 also directed law enforcement officers to "David's" house located at 7014 Cherry Lane, Laurel, Maryland. When a PG County detective and I drove Victim 1 to the house, she identified the house as "David's" house where she, "Mike," "Elsie," "David," and others would hang out.

30. Law enforcement database checks revealed that on December 17, 2013, **JOHN DAVID HAMLETT**, DOB September 29, 1982, **DAVILA**, and two other individuals were detained by Montgomery County police for possession of codeine, methamphetamine, and marijuana.

31. MVA records list an address of 7014 Cherry Lane, Laurel, Maryland for **HAMLETT**. I have also compared the MVA photograph of **HAMLETT** with the photograph of the individual who Victim 1 identified as "David" on the Instagram posting referenced above and I believe it to be the same person.

32. On April 13, 2015, I again met with Victim 1. During that interview, I presented an MVA photograph of **HAMLETT** to Victim 1, who immediately identified the individual depicted as the person she knew as "David" who had transported Victim 1 to various locations to engage in commercial sex acts.

33. On April 15, 2015, Chief United States Magistrate Judge William Connelly issued arrest warrants and criminal complaints charging **MICHAEL ANDREW DAVILA**, **ELSIE PAZMINO**, and **JOHN DAVID HAMLETT** with conspiracy to engage in sex trafficking of a minor in violation of 18 U.S.C. § 1594.



4/23/15
mm

34. On the weekend on April 18-19, 2015, I reviewed **DAVILA**'s Instagram page under username atw_silent and saw a video of a vehicle that **DAVILA** was driving – a 2015 silver Chevy Malibu with license plate number 9BX3204. I ran the plate number through databases accessible to law enforcement and determined that the vehicle was a rental car that was rented from BWI International Airport. I confirmed with Dollar/Thrifty Car Rental that the car was rented in the name of **DAVILA**.

35. On the morning of April 20, 2015, I drove to the Knights Inn located at 3380 Fort Meade Road, Laurel, Maryland 20724. I observed a Silver Chevy Malibu with license plate number 9BX3204 parked in the parking lot of the Knights Inn. I observed **DAVILA** come out to that vehicle and then go back into room 110. I learned from the hotel staff that **DAVILA's** mother Maria Davila was staying in room 110.

36. On April 20, 2015, **DAVILA** was arrested pursuant to the above-described arrest warrant at the Knights Inn after exiting the hotel and attempting to leave in the above-described Chevy Malibu.

37. **DAVILA** provided written consent to search the Chevy Malibu. Device A (the Alcatel One Touch Tablet) was located in the vehicle.

38. On April 20, 2015, United States Magistrate Judge Thomas M. DiGirolamo issued a search warrant for Knights Inn, Room 110 that authorized seizure of, among other items, electronic devices. Devices B-H were located in the hotel room along with clothing, documents, and other items belonging to **DAVILA**.

39. On April 20, 2015, **PAZMINO** was arrested pursuant to the above-described warrant when she arrived at the Prince George's County District 1 Police Station in Hyattsville, Maryland. **PAZMINO's** iPhone 6 (Device I) was seized at the time of her arrest.



TMM

4/23/15
mm

40. On April 22, 2015, **HAMLETT** was arrested pursuant to the above-described warrant at his residence. **HAMLETT** provided consent to seize and search his Blu cellular phone (Device J).

41. While the FBI might already have all necessary authority to examine at least some of Devices A-J, I seek this additional warrant out of an abundance of caution to be certain that an examination of Devices A-J will comply with the Fourth Amendment and other applicable laws.

42. Devices A-J are currently located at FBI Annapolis Resident Agency, 185 Admiral Cochran Road, Annapolis, Maryland. In my training and experience, I know that Devices A-J have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when Devices A-J first came into the possession of the FBI.

43. Based on my training and experience, Devices A-J that are currently in FBI custody appear to be the type of devices that can be used to access the Internet. The cellular phones seized are also the type of devices capable of sending and receiving text messages in addition to accessing the Internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the devices.

44. Based on my training and experience, I know that individuals involved in prostituting minors use electronic devices such as computers, tablets, cellular phones, and other electronic devices capable of accessing the Internet and making telephone calls in order to create online advertisements on Backpage.com and other websites advertising for prostitution, repost ads for prostitution that have previously been created, make online reservations for hotels,



TMR

4/23/15
mm

receive calls from "clients" wanting to set up dates for sexual encounters with the minor, communicate with the minor regarding proceeds earned from prostitution and location of "dates," communicate among co-conspirators regarding transportation of the minor for purposes of prostitution, and provide commentary on social media about prostitution and pimping. As such, I submit that there is probable cause to believe that the electronic devices seized from **DAVILA**, **PAZMINO**, and **HAMLETT** will contain evidence relating to the prostitution of Victim 1 that is more fully described in Attachment B.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

45. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

46. There is probable cause to believe that things that were once stored on Devices A-J may still be stored there, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file

MM



4/23/15
mm

on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

47. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how



4/23/15
mm

the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on Devices A-J because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.



4/23/15
mm

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

48. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of Devices A-J consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

49. *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

TMM



4/23/15
mm

## CONCLUSION

50. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of Devices A-J described in Attachment A to seek the items described in Attachment B.

## REQUEST FOR SEALING

51. It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the warrant is relevant to an ongoing investigation into a conspiracy and not all of the targets of this investigation are aware of the investigation. Based upon my training and experience, I have learned that, online criminals actively search for criminal affidavits and search warrants via the internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

Margaret Mande
Margaret Mande
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on April 23, 2015:

Thomas M. Di Girolamo
UNITED STATES MAGISTRATE JUDGE

TMD

4/23/15
mm

## ATTACHMENT A

The property to be searched that is currently located at the FBI Annapolis Resident Agency, 185 Admiral Cochran Road, Annapolis, Maryland is described as follows:

a. Device A: Alcatel One Touch Tablet, Model P310A, FCCID: RAD451

b. Device B: iPhone 6, IMEI: 35206606669769

c. Device C: iPhone 6, Model A1592, IMEI: 35438606486320

d. Device D: iPhone 4S, model A1387, FCCID: BCG-E2430A

e. Device E: iPad Air, Serial Number: DMQLXVGDF4YD

f. Device F: HP G61 Laptop, Serial Number: CNF9435TFJ

g. Device G: Motorola cellular telephone, IMEI: 359413000759979

h. Device H: HP Pavilion 20 All-In-One, Model 20-B010, Serial Number: 3CR3050TMM

i. Device I: iPhone 6, Model A1549, IMEI: 356987065756874

j. Device J: Blu cellular telephone, Model Dash 5.5, IMEI 1: 353791061320591

This warrant authorizes the forensic examination of Devices A-J for the purpose of identifying the electronically stored information described in Attachment B.

DMM

4/23/15
mm

**ATTACHMENT B**

1. All records on Devices A-J described in Attachment A that relate to violations of 18 U.S.C. 1594 (conspiracy to engage in sex trafficking of a minor), 18 U.S.C. 1591 (sex trafficking of a minor), and 18 U.S.C. 2423(a) (transportation of a minor for purposes of prostitution) and involve **DAVILA, PAZMINO, HAMLETT**, and other co-conspirators, including:

a. Communications, records, documentation, images, videos, and other files regarding persuading, inducing, enticing, coercing, or recruiting any individual to engage in prostitution or any other sexual activity;

b. Communications, records, documentation, images, videos, and other files related to the harboring or transportation of persons to engage in commercial sex acts;

c. Communications, records, documentation, images, videos, and other files regarding any financial or other valuable benefits received in connection with having individuals engage in commercial sex acts;

d. Communications, records, documentation, images, videos, and other files regarding access to and/or interaction with minors, to include the enticement of minors to engage in sexual activity or prostitution;

e. Images depicting the interior or exterior of residences, public establishments, and vehicles connected in any way with the crimes under investigation;

f. All images, videos, messages, communications, records, and other files showing any and all preparatory steps taken in furtherance of the crimes under investigation or showing state of mind of individuals engaged in such crimes;

g. Communications, records, information, documentation, and other files relating to who created, used, or communicated with the account or identifier, including records about their identities and whereabouts;

h. Records, communications, and other information evidencing the use of Pinger, Instagram, Facebook, Twitter, Kik, and other social media websites or apps, include evidence of usernames and any communications regarding the above-listed offenses;



4/23/15
mm

i. All images, messages and communications regarding wiping software, encryption, deletion of files, use of private browsers or settings, or other methods to avoid detection by law enforcement;

j. Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history. This evidence also includes any evidence of the geographic location of the individual using the Device.



4/23/15
mn